## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### TAMPA DIVISION

**D'ANGELO HUTCHINSON,**

      **Plaintiff,**

**v.**                            **Case No.  8:05-cv-833-T-30TGW**

**THE CITY OF ST. PETERSBURG and**
**THE STATE OF FLORIDA ,**

      **Defendants.**

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant the State of Florida's Motion for Summary Judgment (Dkt. 76), Memorandum of Law in support of the same (Dkt. 77), the State of Florida's Amended Motion for Summary Judgment (Dkt. 88), Memorandum of Law in support of the same (Dkt. 89), Plaintiff's Responses in opposition to the same (Dkts. 83, 94), the City of St. Petersburg's Second Motion for Summary Judgment (Dkt. 98), Memorandum of Law in support of the same (Dkt. 99) and Plaintiff's Response in opposition to the same (Dkt. 108).

## BACKGROUND

This is an action against Defendants the City of St. Petersburg and the State of Florida for the alleged false imprisonment of Plaintiff and violation of Section 1983.  The arrest giving rise to this action followed an investigation by St. Petersburg Police officers concerning a car jacking and shooting that occurred on September 12, 2000.

When the investigation into the car jacking began, police detectives conducted several witness interviews, including the victim, Contez Caldwell, and an eyewitness to the crime, David Hayslip. (Dkt. 96).  While Caldwell indicated he could not identify who the shooter and/or car jackers were, Hayslip from a photograph, identified Plaintiff as one of the shooters.  Based on the eyewitness account, early on September 27, 2000, Plaintiff was arrested by the St. Petersburg Police and charged with car jacking.[1]

After his arrest, Plaintiff was transported to the Pinellas County Jail.  Later that morning, Plaintiff appeared before a state court judge for an advisory hearing.  During the advisory hearing, the judge found probable cause to continue holding Plaintiff in jail.   On October 18, 2000, the State Attorney filed a felony information charging Plaintiff with first degree felony car jacking.  Due the nature of the offense, bond was set and while Plaintiff's attorneys tried numerous times to reduce the bond, the requests were not granted.  Plaintiff remained in the Pinellas County Jail until February 20, 2002, when his father posted bond securing his release.

On June 6, 2001, St. Petersburg detectives, Karl Sauer and Carl Watts, interviewed two individuals incarcerated in the Hillsborough County Jail, Reginald Johnson and Yves

---

[1] According to Detective Carl Watt's affidavit, after Plaintiff's arrest, Plaintiff denied any involvement in the shootings and stated he was attending his child's birthday party on the date of the car jacking.  Detective Watts followed up on Plaintiff's alibi statement and contacted Plaintiff's mothers' home, where Plaintiff indicated the party was held.  According to Detective Watts, the woman with whom he spoke could not provide the date on which the alleged birthday party was held.  (Dkt. 6).

Mathieu.[2]   During the interview, Johnson informed the detectives that he was aware of the car jacking and knew the four people involved, i.e. Ashby, Mathieu, Gaines and Alexander Contreras. (Dkt. 96 at 17).   Johnson further stated that Mathieu admitted going to St. Petersburg with Ashby, Gaines and Contreras and indicated that while there he shot "a young black man" for twenty (20) inch tire rims and eighteen (18) inch speakers.  Id. at 17-18.  Johnson also advised that Mathieu informed him that he had "dumped the car after he took the rims and speakers . . . [and] later used the property for his [Mathieu's] own Chevy." Id. at 18.  After interviewing Johnson, the detectives interviewed Mathieu, who denied having any involvement in the car jacking and informed Detectives that Johnson was untrustworthy. He did, however, admit that the tire  rims and speakers found in his home were stolen, but that he had purchased them from Johnson for $2,000.  According to Mathieu, Johnson was known to sell stolen goods.

On June 13, 2001, Detective Watts interviewed Gaines and Ashby at the Hernando County Jail.   During Ashby's interview, he denied having any knowledge regarding the car jacking in St. Petersburg.  He did however, corroborate Mathieu's story on how he obtained the tire rims and speakers, i.e. from Johnson, and also confirmed Mathieu's assessment of Johnson, i.e. his propensity to be untruthful and sell stolen goods.

---

[2] According to the follow up police report, Johnson and Mathieu, along with two other individuals (Jonathon Gaines and Jason Ashby), were arrested on armed robbery charges in Polk County and the City of Lakeland.  During the course of executing the search warrant in that case of Mathieu's residence, the wheels belonging to the owner of the stolen Caprice Classic (the car involved in the subject car jacking) were recovered. (Dkt. 96 at 17).  Thinking a possible connection existed, Watts and Sauer decided to interview Mathieu and Johnson regarding the September 2000 car jacking.

During his interview with Gaines, Detective Watts inquired as to Gaines' knowledge of the September 2000 car jacking. Gaines denied any involvement in the car jacking and also corroborated Mathieu and Ashby's recollection of how Mathieu obtained the tire rims and speakers as well as Johnson's involvement in selling stolen goods. After the interviews,[3] Detective Watts closed the case.

On April 17, 2002, Detective Sauer was contacted by Sergeant Al White with the St. Petersburg Police Department and advised that an Agent with the Federal Bureau of Investigation had contacted Detective Watts and informed him that Mathieu had information concerning the car jacking. (Dkt. 8 at 1). Upon receiving this information, Detective Sauer met and interviewed Mathieu on April 18, 2002, at the Pinellas County Jail. During this interview, Mathieu confessed to being involved in the car jacking along with several other individuals, specifically, Contreras, Johnson, Gaines and Ashby. Mathieu indicated he did not shoot anyone during the car jacking and was only a "look out" person, and stated that neither Plaintiff nor Ricardo Thomas, the other individual arrested in connection with the crime, were involved in the armed robbery. After interviewing Mathieu, Detective Sauer immediately contacted the Assistant State Attorney and provided information concerning Mathieu's confession. Subsequently a Nolle Prosequi as to Plaintiff was filed by the State Attorney's Office, terminating the criminal prosecution against Plaintiff on the car jacking

---

[3] Detective Watts also interviewed Oscar Fowler, an individual Gaines mentioned during his interview and someone who also was an associate of the victim, Caldwell. During the interview, Fowler stated he was aware of the subject car jacking and when shown pictures of Plaintiff and various other individuals, indicated it was his understanding that Plaintiff was involved in the car jacking.

charges.[4]

Plaintiff filed this action on September 28, 2004, alleging malicious prosecution (Count I), Negligent Training and Supervision (Count II), False Arrest and Imprisonment (Count III), and Violation of the Fourth and Fourteenth Amendments to the Constitution and Section 1983 (Count IV).  An Amended Complaint was subsequently filed on June 10, 2005, containing the same allegations (Dkt. 20).  On August 12, 2005, this Court entered an Order dismissing all of Plaintiff's claims except Plaintiff's false imprisonment and Section 1983 claims. (Dkt. 53).  It is upon these claims that Defendants have filed their Motions for Summary Judgment.

## **DISCUSSION**

### A.    **Summary Judgment Standard.**

Summary judgment is appropriate only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party bears the burden of meeting this rather exacting standard. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  In applying this framework, the evidence, and all reasonable factual inferences drawn therefrom, must be viewed in the light most favorable to the nonmoving party. See Arrington v. Cobb County, 139 F.3d 865, 871 (11th Cir.1998); Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.1997).

---

[4] At the time the charges were dismissed against Plaintiff, he was no longer incarcerated, having been released on bond in February of 2002.

Equally clear, however, is the principle that the nonmoving party bears the burden of coming forward with evidence of each essential element of their claims, such that a reasonable jury could find in his or her favor. See Earley v. Champion Int'l Corp., 907 F.2d 1077, 1080 (11th Cir.1990). The nonmoving party "[m]ay not rest upon the mere allegations and denials of [its] pleadings, but [its] response ⋯ must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 835 (11th Cir.1998) ("Summary judgment may be granted if the evidence is 'merely colorable.'") (quoting Anderson, 477 U.S. at 248, 106 S.Ct. 2505). Further, and significantly, mere conclusory, uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment. See Earley, 907 F.2d at 1081. The failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial and requires the court to grant the motion for summary judgment. See Celotex, 477 U.S. at 322.

### B.    False Imprisonment Claims.[5]

In order to prove a false imprisonment claim, a plaintiff must present evidence that establishes (1) an unlawful detention and deprivation of liberty of a person; (2) the detention was against the person's will; (3) no legal authority for the detention; and (4) the detention was unreasonable and unwarranted under the circumstances.  See Montejo v. Martin Memorial Medical Center, Inc., 2006 WL 2419167 at 2 (Fla. 4th DCA 2006).   Probable cause may be raised as an affirmative defense to a claim for false imprisonment. See Rankin v. Evans, 133 F.3d 1425, 1436 (11th Cir. 1998) (citing Bolanos v. Metropolitan Dade County, 677 So.2d 1005 (Fla. 3rd DCA 1996)).  When determining whether probable cause existed at the time of an arrest, a court is to analyze the totality of circumstances surrounding the arrest.  City of St. Petersburg v. Austrino, 898 So. 2d 955, 958 (Fla. 2d DCA 2005) (affirming trial court's grant of summary judgment based on the arresting officer's lack of probable cause).  When examining the totality of the circumstances,

> [A]n assessment of probabilities in that particular factual context [must be done].  These probabilities are "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  From these considerations, common sense conclusions regarding human behavior can be reached.  The facts and circumstances, based upon reasonably trustworthy information, must be such that 'would cause a prudent person to believe' the suspect committed the crime.

Id. (citations omitted).   Moreover, the inquiry into the reasonableness of an officer's "perceptions of critical facts supporting an arrest does not focus upon facts not available to

---

[5] False imprisonment and false arrest are different labels for the same cause of action. Weissman v. K-Mart Corp., 396 So. 2d 1164, 1165 (Fla. 3rd DCA 1981).

him at the time." <u>Austrino</u>, 898 So.2d at 959.

Here, Plaintiff was arrested based on the facts available to the detectives at the time of his arrest.  Detectives attempted to obtain a positive identification from the victim, Caldwell, as to who the perpetrators were.   However,  Caldwell was unable to identify who the perpetrators were and testified that because some of the assailants were wearing masks, he was uncertain of their identities. (Dkt. 24, Ex. 2 at 5).   Detectives also interviewed the only eye witness to the crime, Hayslip, who, according to the police report, without hesitation identified Plaintiff as one of the persons involved in the car jacking. (Dkt. 96 at 12).[6]  Having received positive identification of the suspects from an eye witness and having uncovered no contradictory evidence,  Plaintiff was arrested and charged with felony car jacking.[7] While Plaintiff does not disagree that the determination of whether probable cause exists to arrest an individual depends on the information available to the officer at the time of the arrest (Dkt. 108 at 17), he does contest whether probable cause continued to exist after his arrest which justified his continued incarceration. <u>See</u> <u>id.</u>

      1.      City of St. Petersburg.

The City of St. Petersburg argues that after Plaintiff was arrested, he was released to the custody of Pinellas County Sheriff's Office and was thereafter housed in a County facility, not a City facility.  As such, according to the City, they had no authority to release

---

[6] Mr. Hayslip also identified Plaintiff as one of the persons who came to his business the day after the car jacking allegedly threatening him and advising him to stop telling people he was involved.

[7] Another individual, Ricardo Thomas, was also arrested in connection with this crime.

him.  Moreover, once he was officially charged with a felony, Plaintiff was under the jurisdiction of the State of Florida.  Plaintiff has presented no evidence that at any time after Plaintiff's initial arrest the City of St. Petersburg had the authority to release him from the Pinellas County Jail.  Moreover, Plaintiff, by way of his failure to respond to Defendant City's Requests for Admissions, has admitted that Defendant City "[had no] legal authority to release persons incarcerated in the Pinellas County Jail." (Dkt. 99).

Plaintiff argues that even if the City did not have the authority to release Plaintiff from jail, they had a duty to "follow up on [information regarding Plaintiff's innocence] . . . [and] bring that information to the attention of those who had the authority." (Dkt. 108 at 17). While Plaintiff has cited no case authority for this proposition, assuming *arguendo* that the City had a legal duty to follow up on potentially exculpatory information, this duty was met. As stated in Detective Watt's police report and detailed above, Detectives Watts and Sauer, upon learning of the recovery of various parts of the vehicle involved in the car jacking, specifically the tire rims and stereo speakers, interviewed several individuals to obtain information regarding the car jacking to determine whether there was a connection with Plaintiff.  The information obtained during the interviews did not reveal any information to substantiate and support Plaintiff's release.  Not until April 18, 2002, did detectives receive information sufficient to support Plaintiff's release from jail, i.e. the confession of Mathieu and the identity of those involved in the car jacking.[8]  Plaintiff has presented no evidence that

---

[8] At the time this information was obtained, Plaintiff had been released from jail on bond.

the City at any point during his incarceration obtained any exculpatory evidence regarding his involvement in the car jacking.  As such, the City of St. Petersburg's summary judgment as to Plaintiff's false imprisonment claim is granted.

>    2.    State of Florida.

In reviewing the Complaint, there do not appear to be any allegations against the State of Florida as to the claim of false imprisonment. (Dkt 20 at 5-6).

## C.    Section 1983 claim.

To establish a claim under 42 U.S.C. § 1983, a plaintiff must present evidence that: (1) his constitutional rights were violated; (2) the defendant had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) the policy or custom caused the violation.  See McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004).  The Supreme Court has defined a policy as a decision of a municipality's "duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." Board of County Com'rs of Bryan County, OK v. Brown, 520 U.S. 397, 403-04 (1997).  Additionally, a custom is an act that has not been formally approved, but is so widespread that is has the force of a law of the municipality. Id. at 404.

>    1.    City of St. Petersburg.

In Plaintiff's Complaint, he alleges the City of St. Petersburg has a policy or custom of "incarcerating young black males upon suspicion that they committed a crime, even where no probable cause existed for said arrest and incarceration," and that pursuant to that policy, Plaintiff was arrested and incarcerated. (Dkt. 20 at ¶ 26).  According to Plaintiff, this policy

or custom includes failing to make an effort to "rule out mistaken identity of arrestees [sic] who protest[] their innocence" <u>Id.</u> at ¶ 11.   Summary judgment is appropriate as to this claim.[9]

First, as stated above, Defendant City, on December 2, 2005, served Plaintiff its First Set of Requests for Admissions.  One of these Requests read, "Admit that at the time you were arrested, the City of St. Petersburg Florida had no formal, written policy of incarcerating young black males upon suspicion that they committed a crime even where no probable cause existed for the said arrest and incarceration."  (Dkt. 99 at Admission 9). According to Defendant City, Plaintiff failed to respond to the Requests for Admission, and accordingly, the statement is admitted.[10]   Additionally, Defendant City has provided an affidavit of the Chief of Police for the City of St. Petersburg, Charles Harmon.  In his

---

[9] Plaintiff also alleges that due to the City's inadequate supervision and training, City employees arrested and incarcerated Plaintiff without probable cause.  While these allegations were inartfully plead in the Complaint, this Court, in its Order regarding the Motion to Dismiss filed in this case, permitted the claim to proceed stating that in order for Plaintiff's claims of inadequate training and supervision to withstand a motion for summary judgment, Plaintiff would have to present evidence that the failure to train and supervise amounted to a "deliberate indifference to the rights of persons with whom the police come in contact" (Dkt. 53, fn 2) (citations omitted). "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." <u>Williams v. City of Daytona Beach</u>, 2006 WL 354635 at 19 (M.D. Fla. 2006).  Plaintiff has presented no evidence that substantiates his claim that  the City's failure to supervise and train its police officers was done **knowing** that its failure to do so would result in his arrest.  Accordingly, summary judgment as to Plaintiff's claims for failure to train and supervise under Section 1983 is **granted**.

[10] Pursuant to Rule 36(a), all matters set forth in a request for admission are admitted, unless within thirty (30) days "the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party or by the party's attorney." Fed. R. Civ. P. 36 (a) (2006).  Plaintiff has presented no evidence that he or his attorney filed written answers or objections to Defendant City's Requests.  As such, all such admissions are deemed admitted.

affidavit, Chief Harmon specifically states that the City of St. Petersburg does not have a policy or custom "authorizing or condoning 'incarcerating young black males upon suspicion that they have committed a crime, even where no probable cause exited [sic] for said arrest and incarceration." (Dkt. 36).   As detailed above, Detectives conducted a thorough investigation in 2000 and a follow up investigation in 2001.  Neither investigation uncovered any evidence which supported Plaintiff's alibi or his release for jail.  Not until 2002, was there any information obtained by police which supported Plaintiff's release and the dismissal of charges files against him.  His being an African American male had no bearing on his continued incarceration.  Plaintiff has provided no evidence to the contrary.  His mere assertions that such customs exist are, alone, insufficient to withstand a motion for summary judgment.

As Plaintiff has failed to establish all of the necessary elements of is Section 1983 claim, summary judgment as to the City of St. Petersburg is **granted**.

2.    State of Florida.

Plaintiff's allegations in his Amended Complaint are unclear as to his claims against the State of Florida.  At no point in the Complaint does he allege the State had a policy or custom which resulted in him being charged with a crime.   Additionally, Plaintiff has presented no evidence that his arrest was a result of a policy or custom of the State.  To the extent Plaintiff is claiming the same, summary judgment is appropriate.

While the Complaint is unclear as to the claims against the State, in his opposition motion, Plaintiff asserts the following claims as to the State of Florida: (1) the State should

not have charged Plaintiff with the criminal offense, (2) the State, after causing Plaintiff's

incarceration, continued to incarcerate him in spite of receiving evidence of his innocence,

and (3) the State was negligent in failing to investigate and follow up on the information it

received and continued to cause Plaintiff's incarceration until the charges against Plaintiff

were dropped.[11]   Since it is unclear under what theory Plaintiff is asserting these claims, the

Court will presume Plaintiff is asserting those claims in support of his Section 1983 claim.

     The State argues that Plaintiff's 1983 claim is barred by the Eleventh Amendment.

Under the Eleventh Amendment, a nonconsenting state may not be sued by private

individuals in federal court.   See McClendon v. Georgia Dept. of Community Health, 261

F.3d 1252, 1256 (11th Cir. 2001).   Plaintiff argues that the State has waived its Eleventh

Amendment argument as it failed to raise the defense prior to filing its Amended Motion for

Summary Judgment (Dkt. 94).   However, Plaintiff cites no case to support this argument.

Contrary to Plaintiff's assertions, the Eleventh Amendment grants "the State a legal power

---

[11] In the State's Motion for Summary Judgment, it asserts that Plaintiff, in his answers to interrogatories, asserted two theories of liability: (1) the State negligently failed to properly train and supervise its employees and failed to properly investigate the crimes for which Plaintiff was charged; and (2) the State improperly charged or caused Plaintiff to be charged with "participating in a car jacking". (Dkt. 88 at 3).   Assuming Plaintiff is also asserting these claims, his claims for failure to properly train and supervise were previously dismissed as this Court determined said claims were barred under Florida's immunity doctrine. (Dkt. 53).   Assuming Plaintiff is asserting negligent training and supervision separate and apart from his 1983 claim, Plaintiff has presented no evidence that, assuming the State owed Plaintiff a legal duty, the State's duty was breached when Plaintiff was arrested and charged with car jacking.   As detailed at great length above, an investigation was conducted by the St. Petersburg police department.   Based on the information obtained from this investigation, the State Attorney's office found there was sufficient evidence to charge Plaintiff with a crime.   The fact that exculpatory evidence was discovered two years after his arrest, does not have any bearing on whether, at the time Plaintiff was charged, there was sufficient evidence to support the State charging him with car jacking.

to assert a sovereign immunity defense *should it choose to do so*." <u>McClendon,</u> 261 F.3d at 1257. "Because the Eleventh Amendment represents a constitutional limitation on the federal judicial power . . . the 'Eleventh Amendment defense need not be raised in the trial court.'" <u>Id.</u>[12] Accordingly, the State of Florida's Motion for Summary Judgment and Amended Motion for Summary Judgment are **granted**.

It is therefore ORDERED AND ADJUDGED that:

1.      Defendant the State of Florida's Motion for Summary Judgment (Dkt. 76), and Amended Motion for Summary Judgment (Dkt. 88) are **GRANTED**.

2.      The City of St. Petersburg's Second Motion for Summary Judgment (Dkt. 98) is **GRANTED**.

3.      The Court reserves jurisdiction as to the issue of attorneys' fees and costs.

4.      All pending motions are denied as moot.

5.      The Clerk is ordered to enter judgment in favor of the Defendants and close this case.

---

[12] In both Motions for Summary Judgment, Plaintiff has asked this court to reserve ruling to permit him to conduct discovery to support his claims. This case was removed on May 2, 2005. A Case Management Order was entered on September 15, 2005. (Dkt. 64). Pursuant to the Case Management Order, fact discovery was scheduled to close March, 31, 2006, with the dispositive motion deadline being July 5, 2006. At no time after September 15, 2005 and prior to March 31, 2006 did Plaintiff file a Motion for Extension of the discovery deadline. This request did not come until his response to the various Motions for Summary Judgment, albeit as an alternative to entering summary judgment against him. Had he desired an opportunity to conduct discovery on the various issues contained in the Defendants' Motions for Summary Judgment, he had six months and fifteen days in which to do so. Plaintiff's failure to take advantage of the discovery period and obtain evidence to support his allegations is of no consequence to this Court.

**DONE** and **ORDERED** in Tampa, Florida on September 26, 2006.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

<u>**Copies furnished to:**</u>
Counsel/Parties of Record

S:\Odd\2005\05-cv-833 Motion for Summary Judgment.frm